DEREK BENTSEN (Cal. Bar No. 232550)
Email: bentsend@sec.gov
TIMOTHY N. ENGLAND (Cal. Bar No. 140332)
Email: EnglandT@sec.gov
STEPHEN T. KAISER
Email: Kaisers@sec.gov
ELIZABETH MARSHALL ANDERSON
Email: MarshallAndersonE@sec.gov
100 F Street, NE
Washington, DC 20549
Telephone: (202) 551-6426 (Bentsen)
Facsimile: (202) 772-9282 (Bentsen)

LOCAL COUNSEL
DANIEL O. BLAU (Cal. Bar No. 305008)
Email: blaud@sec.gov
444 S, Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3306
Facsimile: (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>C3 INTERNATIONAL, INC., STEELE CLARKE SMITH III, and THERESA SMITH,<br><br>Defendants. | Case No.  8:21-cv-1586<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff U.S. Securities and Exchange Commission (the "Commission") alleges:

## JURISDICTION AND VENUE

1. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

2. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

3. Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

4. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. Defendant C3 International, Inc. has its principal place of business in this District and offers and sales of securities took place in this District.

## SUMMARY OF THE ACTION

5. This case concerns a securities offering fraud carried out by Defendants Steele Clarke Smith III ("Steele Smith") and Theresa Smith and their California company, Defendant C3 International, Inc. ("C3") (collectively, "Defendants"). From approximately October 2011 through November 2019, Defendants raised approximately $2 million from more than 40 investors by selling stock in C3 through Steele Smith's material misrepresentations and omissions regarding the company's business and its cannabis pill called Idrasil.

6. On C3's and Idrasil's websites, in offering materials, on social media and in investor communications, C3 through Steele Smith misrepresented, among

other things, that Idrasil was patented or patent-pending or trademarked, that most insurance companies reimbursed for Idrasil, and that investor funds would be used for business purposes. In addition, C3 and Steele Smith made statements about Steele Smith's background, education and legal history, but omitted the material fact of Steele Smith's prior criminal conviction. In addition to these false and misleading statements and omissions, the Smiths misappropriated over $1 million of investor funds to pay for their own living expenses. In one instance where an investor sent $100,000 to purchase C3 shares in August 2018, Steele Smith sent $40,000 of it that same day to a Jeep dealership, as a down payment on an expensive SUV for himself.

7. Theresa Smith aided and abetted Steele Smith's and C3's securities fraud violations by overseeing C3's business expenses and managing bank accounts through which investor funds were received and misappropriated.

8. In addition, the Defendants offered and sold C3 stock without filing a registration statement with the Commission or otherwise satisfying an exemption. The Smiths and C3 continue to offer C3 securities to investors on the company's websites and over social media.

9. In this action, the Commission seeks permanent injunctions prohibiting future violations of the federal securities laws by Defendants and conduct-based injunctions permanently enjoining Steele Smith and Theresa Smith from participating, directly or indirectly, in the issuance, purchase, offer, or sale of any security. The Commission also seeks an order barring Steele Smith and Theresa Smith from acting as officers or directors of any issuer whose securities are registered or which is required to file reports with the Commission, an order for all Defendants to disgorge their ill-gotten gains plus prejudgment interest, and an order imposing civil penalties on all Defendants.

## THE DEFENDANTS

10. **C3 International, Inc. ("C3")** is a private, California-based corporation formed in November 2011 with its purported principal place of business in Garden

Grove, California.

11. **Steele Clarke Smith III ("Steele Smith")**, age 53, is believed to currently reside in Garden Grove, California. He is the co-founder of C3 and C3 Patients Association. He is currently listed as the CEO, Secretary, CFO, and Director of C3 according to the certificate filed with the California Secretary of State.

12. **Theresa Smith**, age 60, is believed to currently reside in Garden Grove, California and is the wife of Steele Smith. She is the co-founder of C3 and is its President.

## RELATED ENTITY

13. **C3 Patients Association ("C3PA")** was formed by Steele and Theresa Smith in October 2010 as a nonprofit member association organized for the purpose of providing members with medical marijuana under the California Compassionate Use Act of 1996 and the Medical Marijuana Program Act of 2003, which recognized the right of patients and caregivers to associate collectively or cooperatively to cultivate medical marijuana in a nonprofit organization. From approximately 2010-2015, C3PA sold cannabis products, including Idrasil, and billed insurance companies for reimbursement. C3PA ceased operations in approximately 2015.

## FACTS

### A. Defendants Offered and Sold C3's Securities by Means of Material Misstatements and Omissions

14. Beginning in at least October 2011 and continuing through at least November 2019, Defendants offered and sold C3 stock to investors. The company promoted the offering through its Idrasil website, its C3 website and offering documents publicly posted there. In addition, Steele Smith, or others acting at his direction, provided documents including C3 business summaries and financial projections to prospective investors, and made oral and written statements to them. Defendants also promoted the C3 offering through social media sites.

15. C3's offering raised approximately $2 million from at least 40 investors.

16. The contents of C3's and the Idrasil website, the social media accounts, and all documents provided to investors, including business summaries and financial projections, were drafted, reviewed, and approved by Steele Smith, who had ultimate authority over the statements. Theresa Smith also reviewed the statements.

17. In the C3 offering, Steele Smith, and through him C3, made material misrepresentations and omissions to investors and potential investors.

### 1. Steele Smith and C3 Made Misrepresentations About C3's Intellectual Property and Business

18. Throughout the C3 offering, one of the key features that Steele Smith and C3 touted in C3's business summaries and on C3's website was that Idrasil was either "patented" or "patent pending."

19. C3's website described Idrasil as "patent pending" from the website's inception in 2014 until at least 2018, as did business summaries provided to investors from at least 2012 through 2014.

20. Steele Smith and C3 also represented to investors that Idrasil was patented. In a document provided to investors as early as 2012, Steele Smith stated that Idrasil had a "[p]atent valid through 2037." When early investors received a tour of C3's cannabis growing facility, Steele Smith would pull out a piece of paper in his office and say that it was a patent for Idrasil. He also described to investors in 2016 that C3 held patents for extracting cannabinoids from a liquid to a solid.

21. These claims were false. Instead, Steele Smith had filed a *provisional* patent application in January 2012 with the U.S. Patent and Trademark Office ("USPTO"). Provisional patent applications expire after a year if they are not followed by a related non-provisional patent application. Since Steele Smith never filed a related non-provisional application, the first application expired and no patent was ever issued. Steele Smith admitted in investigative testimony to Commission staff that he never filed a non-provisional patent application related to Idrasil.

22. Steele Smith and C3 also misrepresented that Idrasil had an approved

trademark. On the current Idrasil website, the ® ("registered") symbol appears after the word "Idrasil." Companies are only allowed to use the "registered" symbol if a mark is federally registered with the USPTO.

23. In an investor presentation from 2016, C3 claimed to have the "First U.S. Trademark . . . Application for Cannabis (Marijuana) Product. Approved 12/2015." This was misleading because the only C3 related trademark ever approved by the USPTO was for "C3" not "Idrasil." In fact, the USPTO rejected the "Idrasil" trademark application in April 2015 because "Applicant's goods and/or services consist of, or include, items or activities that are prohibited by the [Controlled Substance Act], namely, cannabis and cannabis extracts." Steele Smith confirmed in investigative testimony that he knew that the "Idrasil" application was denied by the USPTO.

24. In a document provided to several investors beginning in 2016, C3 claimed that Idrasil was "READY NOW for full-time revenue production" and that C3 had $3 million "paid and on account" for an FDA phase-I clinical trial for Idrasil. Neither statement was true. By 2016, as Steele Smith well knew, C3 had no pills, no lab, no warehouse or growing operation, no offices and little money. As for money set aside for a clinical trial, no such payment or account ever existed. In fact, at no time did C3 have $3 million in cash on hand. In investigative testimony to Commission staff, Steele Smith admitted that at no point did C3 have money paid toward a clinical trial.

   2.   **Steele Smith and C3 Misrepresented the Use of Investor Proceeds and the Smiths Misappropriated Investor Funds**

25. From 2011 through at least 2019, Steele Smith (and through him, C3) stated in the business summaries provided to prospective investors or orally represented that C3 would use their investment proceeds for business purposes such as building or expanding growing and lab facilities, launching Idrasil marketing and sales campaigns, clinical trials and business operations. Contrary to those

representations, Steele and Theresa Smith diverted and misappropriated a substantial portion of investor funds for their personal living expenses.

26. Theresa Smith managed the C3 and C3PA bank accounts and reviewed the account statements. Both she and Steele Smith were authorized users in both accounts and had ATM or debit cards linked to the accounts. They each used investor money in the C3 account for cash withdrawals and personal purchases. In addition, Theresa Smith transferred investor money from the C3 account to the C3PA account or to the Smiths' joint personal checking account. Once transferred, Steele and Theresa Smith used some of that investor money for their own personal use. In total, the Smiths misappropriated over $1 million of investor funds.

27. Steele Smith, on receiving $100,000 in the C3 account from an investor in August 2018, used $40,000 of it that same day for a down payment on a Jeep Grand Cherokee Trackhawk. He then used another $38,000 in investor funds in the C3 account to pay the monthly loan payments on the SUV until it was repossessed.

28. Steele and Theresa Smith admitted that they used investor funds for their apartment rent, their food, their dogs' veterinary and grooming expenses, their hair salon, their dentist and their personal cars. In an email she wrote in 2018, Theresa Smith stated that, "everything, including our personal [expenses], needed to run out of the business account due to our status of having an EBT food card…and state funded health insurance…. I must continue…to carry a less than $2k balance in my personal bank account to keep tour [sic] health insurance."

29. Theresa Smith admitted that, regarding the use of investor funds, investor disclosures "could have been worded better."

### 3. Steele Smith and C3 Made Material Omissions about his Felony Conviction

30. From about 2014 to the present, Steele Smith, in websites and C3 investor presentations, made statements disclosing his background and history, but omitted that he was a convicted felon. In 2012, Steel Smith was convicted of

1 | conspiracy to manufacture at least 1000 marijuana plants in *United States v. Smith,*
2 | 8:07-cr-00264-CJC (C.D. Cal.).

31. This information was material to investors, who understood from Steele Smith that he was operating C3 in a way that was in compliance with the law.

### 4. Steele Smith and C3 Made Misrepresentations and Omissions about C3's Ability to Get Insurance to Pay for Idrasil

32. On both the C3 (from at least 2014 to the present) and Idrasil (from at least 2013 to the present) websites and in business summaries provided to investors, Steele Smith and C3 repeatedly stated that Idrasil was reimbursable by "most" health insurance companies [in California]. This was false. For example, in 2014, there were approximately 24 companies providing group and individual health insurance coverage in California. But by 2016, C3PA had received reimbursement from a total of only three health insurance companies and two California worker's compensation funds. The Idrasil website included a FAQ from 2014 to present which asked, "What insurance companies pay for Idrasil?" and answered that C3PA would bill seven different named companies. However, as Steele Smith admitted, C3PA never received reimbursement from two of the specifically named companies.

33. In October of 2013, Steele Smith was warned by his bookkeeper that his statements regarding reimbursement for Idrasil were misleading. The bookkeeper wrote to him, "I'm … concerned about and recommend against claiming that Idrasil is 'now covered by most Health Insurance'. It is misleading…. It leads an investor to believe that Idrasil has been accepted for payment by a lot of insurance companies; or, in your own words, 'most', which is more than half. Since this is not true, it is an unnecessary legal liability." Steele Smith responded, "Point well taken, thank you. We're changing word, from 'most' to 'many'." But the websites still did not make this change.

34. In every case where C3PA received reimbursement from a health insurer or a worker's compensation fund for Idrasil (claims made on behalf of multiple

patients), the insurance companies only reimbursed claims for *one patient each*. Idrasil was not an approved pharmaceutical by the insurance companies. In fact, it should not have been reimbursed under their guidelines, and in those situations where it was reimbursed it was either an outlier situation or an outright mistake.

35. This information was material to the investors, as they expected that the vast majority of C3's profits, which would impact their return on investment, would be derived from insurance company reimbursement for Idrasil.

### 5. Steele Smith and C3 Misrepresented How Investors Would Receive Returns on their Investments

36. Steele Smith (and through him, C3) repeatedly made oral and written misrepresentations to prospective investors about how they would make money on their investment. Steele Smith told investors, both in writing and in business summaries, that their shares would pay dividends until the company was acquired by a large pharmaceutical company, at which point they would be cashed out.

37. In at least 2013 and 2016, Steele Smith orally told prospective investors that pharmaceutical companies had shown interest in purchasing C3. In financial projections that he provided to investors, he forecast that C3 would achieve a minimum of $4.6 million in gross revenue (with later iterations prognosticating minimums of $10 million or even $100 million in gross revenue) in the next year and valuing C3's total equity at over $685 million upon acquisition by a big pharma company. These financial projections were all materially false and/or misleading as they lacked any basis in reality. As Steele Smith knew, C3PA never earned more than $57,000 in any year from Idrasil, and total receipts from 2012-2015 were less than $200,000.

38. Steele Smith also knew that C3PA had never received enough money from insurance companies or otherwise to provide investors with dividends. Indeed, he was aware that the company barely had enough funds to support its operations, and that C3PA had run out of Idrasil pills by 2015 and had no plans to make more.

39. No investors ever received any dividends from C3.

40. Further, the prospects of C3 being acquired by a big pharma company were nil, given that Idrasil was derived from cannabis, a Schedule I illegal substance, and that (as described above) most insurance companies rejected claims for it. Steele Smith admitted that he had approached several big pharma companies about either buying C3 or licensing the rights to sell Idrasil. He never heard back from a single one.

### 6. Lulling Statements

41. When investors questioned Steele Smith after they invested about what happened to their investments and when they would receive any money from C3, he repeatedly put them off by telling them, in e-mails and text messages, that they would be bought out at a premium in a short timeframe (usually one to three months).

42. This behavior began in 2015 and continues to the present.

43. He represented that C3 had a "building in escrow" and that as soon as the deal closed, he would have the funds to buy out the investor. These statements were false. C3 never had a building in escrow at any point during the relevant time period and never had enough cash on hand to go into escrow for the types of buildings that Steele Smith described to investors.

44. When asked in investigative testimony about specific lulling statements he made to a particular investor, Steele admitted that he "told her what she wanted to hear."

### B. Theresa Smith Aided and Abetted Steele Smith's and C3's Securities Fraud Violations

45. Theresa Smith knew, or was reckless in not knowing, of Steele Smith's and C3's primary securities fraud violations, and substantially assisted in them. She was co-founder with Steele Smith of C3 and C3PA and was C3's president. She managed the day to day operations of both companies, including managing their bank accounts and paying the companies' expenses. She was therefore financially

responsible for all the items necessary to reach investors and defraud them, and collected the fruits of that fraud.

46. She paid for and reviewed the company websites and investor materials which made those statements. She was aware of the falsity (or reckless in not knowing it) of at least some of the statements Steele and C3 provided to investors. For example, she reviewed business summaries where Steele Smith told investors that their money would be used for business purposes while she, together with Steele, actively misappropriated investor funds for their personal benefit.

C. **Defendants Offered and Sold C3 Stock in Violation of the Securities Registration Requirements**

47. Beginning in at least October 2011 and continuing through at least November 2019, C3, Steele Smith and Theresa Smith offered and sold C3 stock to investors. The company promoted the offering in a number of ways, including through its main website and offering documents publicly posted there. C3's offering raised approximately $2 million from at least 40 investors, all but two of whom were United States citizens. U.S. Investors were mostly from California, but also included investors in other states including Oregon, Tennessee and Maryland. Investors paid for the C3 shares, at prices ranging from $1 to $100, with U.S. dollars through wires or checks. In exchange for their funds, C3 sent nearly all investors stock certificates that showed the number of shares purchased.

48. Defendants pooled the investor deposits in a bank account belonging to C3. Steele Smith told investors that Defendants would use their money for business purposes such as building or expanding cannabis growing and lab facilities, launching Idrasil marketing and sales campaigns, clinical trials and business operations, which, if successful, would cause a reasonable person to expect an increase in the value of the shares.

49. Defendant Steele Smith and C3 orally and in documents assured prospective investors that they would receive dividends from their investments, and

that eventually C3 would be purchased by a major pharmaceutical company for not less than $1 billion, which would provide a 1,000x return on investment.

50.     The C3 shares offered and sold by Defendants are securities. Under the federal securities laws, C3, Steele Smith, and Theresa offered and sold these securities from at least October 2011 through November 2019. Defendants never filed a registration statement with the Commission for the offer and sale of C3 securities.

51.     No exemptions from registration applied to the C3 offering. The C3 offering involved a general solicitation of investors and was made to investors throughout the United States. Defendants took no steps to verify investors' accredited status.

52.     C3 is liable for these registration violations as the issuer of its stock. During the offering, investors sent funds to C3's bank account to purchase the stock.

53.     Steele Smith, a co-founder and CEO, is liable for these registration violations because he directly offered and sold C3 stock. He was the public face of C3 and directly promoted the C3 offering online through the C3 website, social media accounts, conferences, and interviews to cannabis company-focused media. He reviewed and approved the offering documents that were posted on C3's website to solicit investors. He also had authority over the content of C3's website.

54.     Theresa Smith is liable for these registration violations because she indirectly offered and sold the C3 stock and was a necessary participant and substantial factor in its offer and sale. As a co-founder and President of C3, Theresa Smith played an instrumental role in the offering as she paid for C3's advertisements, websites and offering materials without which the offering could not have been conducted. She also collected the money from the investors and placed it into C3's bank account, which she directly controlled.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### (Against Defendants Steele Smith and C3)

55. The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

56. Defendants Steele Smith and C3, in selling C3 securities to investors, made misstatements as to: (1) C3's intellectual property and business, including statements regarding patents and trademarks, (2) their use of investor proceeds, (3) C3's ability to get insurance to pay for Idrasil and (4) as to C3's revenue and projections and how investors would receive a return on their investment. They also made material omissions regarding Defendant Steele Smith's criminal history. Defendant Steele Smith and through him, C3, knew or were reckless in not knowing that their statements were false and/or misleading at the time they were made, or that their omissions contained material facts necessary to render the statements made not misleading.

57. By engaging in the conduct described above, Steele Smith and C3, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

    (a) Employed devices, schemes, or artifices to defraud;

    (b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    (c) Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

58. By reason of the foregoing, Steele Smith and C3 violated, and unless

restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1), (2), and (3) of the Securities Act

### (Against Defendants Steele Smith and C3)

59. The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

60. Defendant Steele Smith and through him C3, in the offer or sale of C3 securities to investors, made misstatements as to (1) C3's intellectual property and business, including statements regarding patents and trademarks, (2) their use of investor proceeds, (3) C3's ability to get insurance to pay for Idrasil and (4) as to C3's revenue and projections and how investors would receive a return on their investment. They also made material omissions regarding Defendant Steele Smith's criminal history. Defendant Steele Smith and through him, C3, knew or were reckless in not knowing that their statements were false and/or misleading at the time they were made, or that their omissions contained material facts necessary to render the statements made not misleading. Defendants Steele Smith and C3 obtained money by means of the fraud, as C3 received the investors' funds from the sales C3 stock, and Steele Smith misappropriated some of the investor funds.

61. By engaging in the conduct described above, Defendants Steele Smith and C3, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

    (a) With scienter, employed devices, schemes, or artifices to defraud;

    (b) With scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in

1 light of the circumstances under which they were made, not misleading; and

2 (c) With scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

62. By reason of the foregoing, Steele Smith and C3 violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

### Aiding and Abetting

### Violations of Section 17(a) of the Securities Act

### (Against Defendant Theresa Smith)

63. The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

64. Through the conduct described above, Steele Smith and C3 violations Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

65. Defendant Theresa Smith knowingly or recklessly provided substantial assistance to Steele Smith and C3's violations of Section 17(a) of the Securities Act. She managed the day to day operations of C3 and C3PA, including managing their bank accounts and paying the companies' expenses. She was therefore financially responsible for all the items necessary to reach investors and defraud them, and collected the fruits of that fraud. She paid for and reviewed the company websites and investor materials which made false statements to investors. She was aware of the falsity (or reckless in not knowing it) of at least some of the statements Steele Smith and C3 provided to investors. For example, she reviewed documents where Steele told investors that their money would be used for business purposes while she, together with Steele, actively misappropriated investor funds for their personal benefit.

66. Pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Theresa Smith is deemed to be violation of Section 17(a) of the Securities Act to the same extent as Steele Smith and C3 and, unless enjoined, will again aid and abet violations of those provisions.

## FOURTH CLAIM FOR RELIEF

### Aiding and Abetting

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

### (Against Defendant Theresa Smith)

67. The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

68. Through the conduct described above, Steele Smith and C3 violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

69. Defendant Theresa Smith knowingly or recklessly provided substantial assistance to Steele Smith and C3's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. She managed the day to day operations of C3 and C3PA, including managing their bank accounts and paying the companies' expenses. She was therefore financially responsible for all the items necessary to reach investors and defraud them, and collected the fruits of that fraud. She paid for and reviewed the company websites and investor materials which made false statements to investors. She was aware of the falsity (or reckless in not knowing it) of at least some of the statements Steele Smith and C3 provided to investors. For example, she reviewed documents where Steele told investors that their money would be used for business purposes while she, together with Steele, actively misappropriated investor funds for their personal benefit.

70. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t], Theresa Smith is deemed to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as Steele Smith and C3 and, unless enjoined, will again

aid and abet violations of those provisions.

## FIFTH CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against All Defendants)

71. The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

72. Defendant C3, as the issuer of the securities, directly offered and sold securities in the form of C3 stock.

73. Defendants Steele Smith and Theresa Smith, directly and indirectly, offered and sold C3 stock, and were necessary participants and substantial factors in C3's offers and sales of C3 stock.

74. By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

75. By reason of the foregoing, Defendants directly or indirectly violated, and unless restrained and enjoined, will continue to violate, Section 5 of the Securities Act [15 U.S.C. § 77e].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment finding that Defendants committed the securities law violations alleged in this Complaint and:

### I.

Permanently enjoin Steele Smith, Theresa Smith and C3 from directly or

indirectly violating Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e, 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder;

## II.

Permanently enjoin C3, Steele Smith and Theresa Smith from, directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent the Smiths from purchasing or selling securities listed on a national securities exchange for their own personal accounts;

## III.

Enter an Order pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act barring Steele Clarke Smith III from acting as an officer or director of any issuer whose securities are registered with the Commission pursuant to Section 12 of the Exchange Act or which is required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

## IV.

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre-judgment and post-judgment interest, derived from the securities law violations set forth in this Complaint;

## V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**VII.**

Grant such other and further relief as this Court may determine to be just and necessary.

In accordance with Fed. R. Civ. P. 38 and C.D. Cal. L.R. 38-1, Plaintiff U.S. Securities and Exchange Commission hereby demands a jury trial on all issues so triable.

Dated: September 28, 2021

/s/ Derek Bentsen
Derek S. Bentsen
Timothy N. England
Stephen T. Kaiser
Elizabeth Marshall Anderson
Daniel O. Blau
Attorneys for Plaintiff
U.S. Securities and Exchange Commission